# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

In re:

RICHARD MARTIN LEWISTON

    Debtor.

_____/

RICHARDS-PITT, L.L.C., GREGORY RICHARDS
CS TRUST and GREGORY RICHARDS MARITAL
TRUST,

      Plaintiffs,

vs.

RICHARD MARTIN LEWISTON,

    Defendant.

_____/

Case No: 12-58599-pjs
Chapter 7
Honorable Phillip J. Shefferly

Adv. Pro. No.

## COMPLAINT OBJECTING TO DEBTOR'S DISCHARGE
## PURSUANT TO 11 U.S.C. § 523

NOW COME Plaintiffs, Richards-Pitt, L.L.C., Gregory Richards CS Trust and Gregory

Richards Marital Trust, by and through their attorneys, Morganroth & Morganroth, PLLC and

Sullivan, Ward, Asher & Patton, P.C., of counsel, and, for their Complaint Objecting to Debtor's

Discharge Pursuant to 11 U.S.C. § 523, hereby state as follows.

## PARTIES AND JURISDICTION

1.    Plaintiff, Richards-Pitt, L.L.C. ("Richards-Pitt"), is a Michigan limited liability

company located in the Eastern District of Michigan, Southern Division.

2.    Plaintiff, Gregory Richards CS Trust, is a Michigan trust in which a trustee,

Murray Pitt, is a resident of the State of Florida.

3.    Plaintiff, Gregory Richards Marital Trust, is a Michigan trust in which a trustee,

Murray Pitt, is a resident of the State of Florida.

4.      Defendant, Richard Martin Lewiston ("Lewiston"), is a resident of the Eastern District of Michigan, Southern Division, and has conducted business herein at all times relevant hereto.

5.      On August 13, 2012, Lewiston filed a Voluntary Petition under Chapter 7 of the Bankruptcy Code (11 U.S.C. 101, *et seq.*[1]) in the Bankruptcy Court for the Eastern District of Michigan, Southern Division, which presently pends in this Court.

6.      This adversary proceeding seeks a judgment that the Defendant is not entitled to a discharge under 11. U.S.C. § 523 and it is therefore a core proceeding within 28 U.S.C. § 157(b).

7.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

8.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

9.      The bar date for filing proofs of claim is January 14, 2013.

## GENERAL ALLEGATIONS

10.     Murray Pitt maintained a very close friendship with Lewiston for many years.

11.     Lewiston had a business relationship with Murray Pitt's late son-in-law, Gregory Richards, as they invested in a number of real estate development projects together.  Gregory Richards' investments are as follows.

A.      Richards-Pitt maintains a 25% ownership interest in Apartments at Cambridge Company, L.L.C. ("Apartments at Cambridge"), a condominium development in Canton Township, Michigan in which Lewiston maintains a 25% ownership interest and served

---

[1]      References to the Bankruptcy Code are to the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, as amended, and will hereinafter be referred to as "Section _____".

as the Managing Member who handled all of the day-to-day operations of the company.

B.     Richards-Pitt also maintains a 16⅔% ownership interest in each of two real estate development companies in Canton Township, Michigan known as Capitol Park Associates, L.L.C. ("Capitol Park") and West Town Line Associates, L.L.C. ("West Town Line").  Lewiston served as the Managing Member who handled all of the day-to-day operations of each company.

C.     Gregory Richards became a 50% owner in a company known as Peninsula Development Associates, L.L.C. in which Lewiston was the other 50% owner.  Peninsula Development Associates, L.L.C. owns 33⅓% of a large real estate development company in Canton Township, Michigan known as Summer Park Associates, L.L.C. ("Summer Park") in which Lewiston served as the Managing Member who handled all of the day-to-day operations of the company.  Gregory Richards' ownership interest in Peninsula Development Associates, L.L.C. is held by the Gregory Richards CS Trust.

D.     Gregory Richards also became a 33⅓% owner in a company known as FQA Associates, L.L.C. whose purpose was to own and operate the French Quarter Apartments in Southfield, Michigan.  Lewiston maintained a 33⅓% ownership interest in FQA Associates, L.L.C. and served as the Managing Member who handled all of the day-to-day operations of the company.  Gregory Richards' ownership interest in FQA Associates, L.L.C. is held by the Gregory Richards Marital Trust.

E.     Gregory Richards became a 33⅓% owner in a company known as JGR Associates, L.L.C. in which Lewiston was the other 50% owner as well as the Managing Member who handled the day-to-day operations of the company.  JGR Associates, L.L.C. owned 50% of a large real estate development company in Ypsilanti, Michigan known as Tremont Park

Associates, L.L.C. Gregory Richards' 33⅓% ownership interest in JGR Associates, L.L.C. is held as follows: the Gregory Richards CS Trust and the Gregory Richards Marital Trust each own ½ of Gregory Richards' ownership interest giving each trust a 16⅔% ownership interest in JGR Associates, L.L.C.

12. Murray Pitt and/or his revocable trust had signed personal guarantees of loans secured by mortgages with various lenders on Apartments at Cambridge, Capitol Park, West Town Line and Summer Park. Murray Pitt agreed to sign such guarantees based upon his close personal ties with Lewiston as well as Lewiston's representations that Gregory Richards' investments would be profitable. As but one example, Lewiston represented to Murray Pitt that Summer Park was valued well in excess of their guarantees.

13. Murray Pitt was effectively forced to assume, albeit passively, the management of Gregory Richards' investments with Lewiston after Gregory Richards perished in the September 11, 2001 terrorist attacks at the World Trade Center in New York.

14. Murray Pitt implicity trusted Lewiston and relied upon Lewiston to properly manage the companies in which Gregory Richards had invested by virtue of his (Murray Pitt's) close friendship with Lewiston as well as Lewiston's decades of experience in residential real estate, an industry in which Murray Pitt had no experience and no desire to enter.

15. The companies in which Gregory Richards invested were not profitable and resulted in Murray Pitt having to arrange for Plaintiffs to make capital contributions of more than $7 million pursuant to capital calls issued by Lewiston.

16. Lewiston's explanation for the lack of profitability and substantial capital calls was that many of the companies were in the early stages of development before any profits could be generated and that the depressed real estate market was compounding the problem.

17.     Given their close friendship, Lewiston's real estate experience and the fact that the real estate market was in fact depressed, Murray Pitt had no reason to doubt Lewiston's explanation.

18.     On or about April 2, 2008, Lewiston issued a capital call in connection with Capitol Park and West Town Line to seek reimbursements for purported loans that Lewiston made to those companies mainly in 2006 and 2007.  Murray Pitt responded to the capital call on or about April 8, 2008.  Unbeknownst to Murray Pitt until retaining counsel in these bankruptcy proceedings, Lewiston had written off his (Lewiston's) interests in Capitol Park and West Town Line in his 2006 tax returns as worthless and bad debts.

19.     On May 30, 2008, Lewiston executed an agreement with Murray Pitt to indemnify and hold Murray Pitt harmless in connection with the guarantee that Murray Pitt (or his trust) signed on a development loan for West Town Line for any amounts over and above Richards-Pitt's pro rata ownership interests in exchange for Murray Pitt entering into a forbearance agreement on the loan which was in default.  Again, Murray Pitt had no knowledge of the fact that Lewiston had written off his (Lewiston's) interest in West Town Line in his 2006 tax returns as a worthless and bad debt.

20.     During the summer of 2009, Murray Pitt and Lewiston were dealing with Bank of America in connection with development loans on which Capitol Park, West Town Line and Summer Park were in default and for which the Lewiston, Murray Pitt (or his trust) and the other member of those companies had signed guaranties.  Although the other member came to a quick settlement for significantly less than that member might have otherwise owed, Lewiston failed to agree to such a settlement representing to Murray Pitt that Lewiston was just waiting for certain other financial arrangements to come through before he could close on such a settlement.  To

5

allay Murray Pitt's concerns as to whether Lewiston had sufficient funds to resolve the loan defaults, Lewiston issued a July 21, 2009 memorandum to Murray Pitt stating that Lewiston was holding cash reserves of $1.8 million which Lewiston deemed to be sufficient to honor his obligations in connection with the Bank of America loans to Capitol Park, West Town Line and Summer Park.

21.     Thereafter, Lewiston amended his tax returns for 2008 claiming that his investment in Summer Park was worthless in direct contravention to his prior representation to Murray Pitt that the development was worth $30 million.

22.     During the first part of 2010, it came to Murray Pitt's attention that Lewiston was being sued by his longtime business partners, the Smith family (Case No. 108330-CZ in the Oakland County Circuit Court before the Honorable Martha D. Anderson), for millions of dollars in connection with Lewiston's alleged diversion of funds from numerous companies, including Apartments at Cambridge where Richards-Pitt has made capital calls in excess of $2.4 million.

23.     In the summer of 2010, after approximately one year of dealing with Bank of America in connection with the loan defaults by Capitol Park, West Town Line and Summer Park, Lewiston finally represented to Murray Pitt that he would be able to close on a settlement as he had the funds and financial arrangements in place.  By that time, however, the terms of the settlement with Bank of America were far less favorable to Richards-Pitt, Peninsula Development Associates, L.L.C. and Lewiston than they were with respect to the other member of Capitol Park, West Town Line and Summer Park who settled with Bank of America one year earlier due to Lewiston's delay.

24.     With the Bank of America settlement set to close, Lewiston contacted Murray Pitt at the eleventh hour and stated that he (Lewiston) somehow did not have the funds to cover his

portion of the settlement amount despite his statements to the contrary, but that he would have such funds within 60 days and would sign a promissory note and consent judgment for Richards-Pitt to front such funds for Lewiston.

25.     Given Richards-Pitt's need for the settlement in order to avoid Bank of America giving up and suing for the full balance of the loan defaults under Murray Pitt's (or his trust's) guarantees, Richards-Pitt agreed to front Lewiston's portion of the settlement funds in exchange for another indemnification agreement, Promissory Note and Confession of Judgment which Lewiston executed in favor of Richards-Pitt on August 13, 2010.  The Promissory Note bore a maturity dated of August 13, 2011.

26.     Shortly thereafter, on August 25, 2010, Lewiston issued a memorandum to the members of Apartments at Cambridge stating that he would be issuing a capital call on the basis that two companies that Lewiston was managing -- Founders Woods Associates and Sunflower Seven Associates -- had demanded repayment of more than $2.5 million in purported loans to Apartments at Cambridge even though those companies had no involvement whatsoever in Apartments at Cambridge and Lewiston had never informed Murray Pitt of Lewiston's use of any purported intercompany loans involving Apartments at Cambridge which had been hemorrhaging money and carried a large mortgage balance of more than $2 million with its lender.

27.     As of August 14, 2011, Lewiston was in default under his Promissory Note to Richards-Pitt.  Richards-Pitt sued Lewiston on October 13, 2011 (Case No. 11-122385-CK in the Oakland County Circuit Court) and a Judgment was entered on October 14, 2011 for the amount of $1,604,790, plus interest at 10% per annum, plus Richards-Pitt's reasonable attorneys' fees and costs of collection.

7

28.     With his debts mounting, Lewiston voluntarily filed his Chapter 7 bankruptcy petition on August 13, 2012.

29.     While retaining counsel to pursue their claims herein against Lewiston, Plaintiffs have discovered that, although Gregory Richards Marital Trust has not received a distribution in connection with the French Quarter Apartments since 2005, Lewiston testified during an arbitration evidentiary hearing in February 2009 that FQA Associates, L.L.C. has been profitable since the day the company purchased the Apartments and makes regular distributions even though none have been made to the Gregory Richards Marital Trust since 2005.

30.     As set forth in Plaintiffs' Complaint Objecting to Debtor's Discharge Pursuant to 11 U.S.C. § 727 which was filed against Lewiston concurrently with this Complaint, Lewiston filed a Summary of Schedules, Schedules A through J, a Declaration Concerning Debtor's Schedules and a Statement of Financial Affairs on August 27, 2012. Lewiston also filed an Amended Schedule B and an Amended Statement of Financial Affairs on September 17, 2012. Absent from these bankruptcy filings with the Court was an accounting for the more than $32 million in net income declared by Lewiston in 2006 as well as for the $9 million in U.S. Treasury Bills that Lewiston liquidated in 2007.

31.     Also absent from Lewiston's bankruptcy filings with the Court was a disclosure of Lewiston's ownership interests, direct and/or indirect, in more than two dozen different companies with significant if not substantial assets (in the form of real property, apartments, rent, management fees, etc.), including, but not limited to:

        A.     FQA Associates, LLC;

        B.     Pilgrim Village Associates;

        C.     The Richard M. Lewiston Company;

D.    PVA Associates Limited Partnership;

E.    Stratford Apartments, LLC;

F.    The Heights Apartments Limited Partnership;

G.    The Heights Group, LLC;

H.    Greentrees Apartments Limited Partnership;

I.    Sullivan-Smith, Inc.;

J.    Practical Management Company;

K.    Green Acres Associates Limited Partnership;

L.    Tap Liquidating Company, LLC;

M.    RSJC Associates Limited Partnership;

N.    Cambridge Development Associates;

O.    Island Lake Associates;

P.    Founders Woods Associates;

Q.    Fairway West Associates;

R.    Sunflower Seven Associates;

S.    Summer Park Associates, LLC;

T.    Practical Development Co.;

U.    Practical Home Builders, Inc.;

V.    Starlight Homes, Inc.;

W.    Coolidge Commercial Associates, LLC;

X.    Southpointe Square Apartments Limited Partnership;

Y.    Sterling Lake Apartments;

Z.    Century Realty Investment Company Limited Partnership;

9

AA.   Legacy Development Associates, LLC;

BB.   Investment Advisors Company;

CC.   Big Beaver-Rochester Properties Limited Partnership;

DD.   Berger-Lewiston-Smith Realty Corporation;

EE.   B&L Realty Investments Limited Partnership;

FF.   Kingsley-Moravian Company Limited Partnership; and

GG.   Stephenson-Madison Heights Company Limited Partnership.

32.   Based upon Lewiston's testimony at the October 25, 2012 continuation of the Creditor's Meeting that his bankruptcy filings of August 27, 2012 and September 17, 2012 were truthful and accurate, it must be the case that Lewiston transferred his ownership interests in the above-referenced companies to his daughter, Leslie Lewiston Etterbeek, his son-in-law, Jeffrey Etterbeek and/or his other relatives or insiders as defined in the Bankruptcy Code so that Lewiston could avoid his debts to Plaintiffs. Lewiston made these transfers either within one year, but not more than six years, from the date of filing his bankruptcy petition in this matter.

33.   Lewiston's transfers: (a) were and are intended to hinder, delay or defraud Plaintiffs; (b) were made without receiving a reasonably equivalent value in exchange therefor; (c) done when Lewiston was insolvent or became insolvent as a result of said transfers; (d) after said transfers, Lewiston's remaining assets were unreasonably small in relation to the transfers; and (e) Lewiston believed that he would incur debts beyond his ability to pay as said debts were incurred.

34.   By virtue of Lewiston's conduct against Plaintiffs, Lewiston should be denied a bankruptcy discharge pursuant to Section 523.

## COUNT I
## EXCEPTION FROM DISCHARGE UNDER 11 U.S.C. § 523(a)(2)(A)

35.     Plaintiffs hereby incorporate by reference and reallege the allegations set forth in Paragraphs 1 through 34 as if fully restated herein.

36.     11 U.S.C. § 523(a)(2)(A) provides that an individual debtor is not discharged from a debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by– false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."

37.     Lewiston's debt to Plaintiffs is excepted from discharge because such debt was obtained by false pretenses, false representations, and actual fraud based upon the following, without limitation.

A.     Lewiston ran the companies in which Plaintiffs maintain ownership interests with Lewiston as his alter egos, completely disregarding the company forms and agreements, and treating such companies as his own personal piggy banks where he consistently issued checks without authorization for his or his family's own benefit.

B.     For the years 2006 forward, the tax returns and K-1 forms prepared for the companies in which Plaintiffs maintain ownership interests with Lewiston reflected so-called intercompany loans which, in reality, were the funds that Lewiston diverted for his or his family's own benefit.

C.     Lewiston misrepresented the value of Summer Park even though the investment was never worth anywhere near that amount and ended up being worthless due to Lewiston's actions diverting funds for his and his family's benefit.

D.     Lewiston gave false, untruthful, inaccurate and misleading explanations for why capital calls from Plaintiffs were needed and why the companies in which Plaintiffs

invested were not profitable.

E.     Lewiston issued capital calls in connection with the companies in which Plaintiffs invested long after Lewiston had written off his own interests in such companies as bad debts and worthless.

F.     Lewiston executed indemnification agreements with Murray Pitt on May 30, 2008 and August 13, 2010 without any present intention of honoring such agreements, which in fact Lewiston did not honor.

G.     Lewiston misrepresented and misstated his financial condition to Murray Pitt, orally and in his July 21, 2009 memorandum, for the purpose of having Richards-Pitt pay all settlement amounts in connection with the West Town Line, Capital Park and Summer Park loan defaults.

H.     Lewiston executed the August 13, 2010 Promissory Note and Confession of Judgment in favor of Richards-Pitt without any present intention of honoring such documents, which in fact Lewiston did not honor.

I.     Lewiston misrepresented and misstated the financial condition of FQA Associates, L.L.C. inasmuch as the French Quarter Apartments have been profitable and have regularly paid distributions since their purchase by FQA Associates, L.L.C. even though no such distributions were paid to the Gregory Richards CS Trust since 2005.

J.     With respect to Apartments at Cambridge, Lewiston issued a memorandum dated August 25, 2010 misrepresenting and misstating intercompany loans so that Lewiston and his family could seek repayments to which they were not entitled.  As but a few examples, Lewiston diverted well in excess of $8 million to Apartments at Cambridge from other companies that he was managing even though: (a) such transfers were forbidden by those

companies' respective partnership, operating and shareholder agreements; (b) Lewiston improperly booked many such transfers as loans made by Lewiston despite the fact that the monies came from those other companies and reflected other parties' ownership interests; and (c) Lewiston reimbursed himself for many such transfers -- Lewiston received checks totaling more than $6.6 million -- despite the fact that they came from those other companies and reflected other parties' ownership interests and therefore are not accounts receivable of Lewiston, but rather, those of the companies from which the monies were transferred and their members, partners, or shareholders, as the case may be.

K.      By way of illustration and not limitation, in managing the day-to-day operations of Apartments at Cambridge, Lewiston diverted as much as 50%, and perhaps more, of the company's gross revenue to himself and his affiliates.  Lewiston diverted nearly $590,000 to Lewiston-Crescentini Homes, Inc., a company owned by his son, Jason Lewiston, even though such persons or entities had no involvement whatsoever in Apartments at Cambridge.  Lewiston diverted nearly $4.2 million to Outdoor Solutions, Inc., a landscape contracting company owned by his son-in-law, Jeffrey Etterbeek, who is a tennis instructor by trade, and such amount is as much as four times the amount of money that the landscaping should have cost.  Curiously, there are no records of any bidding for such purported landscaping work. Lewiston diverted more than $1.7 million to LR Management Services Corporation, a purported apartment management company owned by Lewiston's daughter, Leslie Lewiston Etterbeek, even though: (a) Apartments at Cambridge is actually a condominium development such that no apartment management, or no management for the monies transferred, is required; (b) there is no documentation justifying the more than $1.7 million paid to LR Management Services Corporation (e.g., who was paid from this money and for what were they paid); (c) there are no

records of any bidding for the purported work for which LR Management Services Corporation was paid; and (d) Leslie Lewiston Etterbeek's company, Traditions Brokerage Services Corporation, was paid commissions of more than $1.5 million on condominium sales -- an amount far in excess of the reasonable value of services rendered and in excess of the traditional amounts due for like services rendered.

L.     Lewiston used the personal guarantees executed by Murray Pitt (or his trust) in connection with the various Plaintiffs to hold Plaintiffs hostage and prevent them from pursuing any action against Lewiston for mismanaging the companies in which Plaintiffs invested for fear of the guarantees being pursued by the respective lenders.

M.     To avoid his debts to Plaintiffs and obtain a bankruptcy discharge, Lewiston transferred his assets to his wife, children and his children's spouses within one year, but not more than six years, from the date of filing his bankruptcy petition in this matter.  Such assets include more than $32 million in net income declared by Lewiston in 2006 as well as $9 million in U.S. Treasury Bills that Lewiston liquidated in 2007.  Such assets further include ownership interests, direct and/or indirect, in more than two dozen different companies with significant if not substantial assets in the form of real property, apartments, rent, management fees and other assets.  The transfer alleged above and others were fraudulent and the consequences thereof and resulting damages are exempted from discharge as amounts created by Lewiston's fraud.

38.     Lewiston's conduct constitutes a false pretense because it was a mute charade intended to create or foster a false impression from Plaintiffs that: (a) Lewiston was properly running the companies in which Plaintiffs maintain ownership interests with Lewiston; (b) Lewiston would honor his commitments to Plaintiffs; and (c) the loans and/or intercompany

loans on the companies' books and records were legitimate. Lewiston's conduct further constitutes a false pretense because Lewiston failed to disclose material facts to avoid his debts to Plaintiffs while incurring further debts by virtue of mute charade. Among other material facts set forth above, Lewiston failed to disclose: (a) his diversion of funds from the companies in which Plaintiffs maintain ownership interests with Lewiston; (b) Lewiston's transfer of his assets; (c) West Town Line, Capitol Park and Summer Park being worthless investments; (d) FQA Associates, L.L.C.'s profitability and regular distributions; and (e) Lewiston's lack of any present intention of honoring his indemnification agreements, Promissory Note or Consent Judgment.

39.     Lewiston's conduct constitutes a false representation because Lewiston represented to Plaintiffs -- orally, through the tax returns and K-1 forms prepared for the companies in which Plaintiffs maintain ownership interests with Lewiston for the years 2006 forward and through his memoranda, indemnification agreements and/or capital calls -- that: (a) Lewiston was properly running the companies in which Plaintiffs maintain ownership interests with Lewiston; (b) Lewiston would honor his commitments to Plaintiffs; and (c) the loans and/or intercompany loans on the companies' books and records were legitimate. The representations made by Lewiston were false and untrue, and created as to Plaintiffs a debt by virtue of Lewiston's fraud.

40.     Lewiston's conduct constitutes actual fraud because Lewiston's conduct involved deceit, artifice, trick and design involving direct and active operation of Lewiston's mind to: (a) circumvent and cheat Plaintiffs out of distributions and other funds pertaining to their ownership interests in the various companies with Lewiston and divert the funds to Lewiston, his family and other entities, in which Plaintiffs do not have an interest; and (b) cause Plaintiffs to pay for

15

Lewiston's debts.

41.    Lewiston's false pretenses, false representations and actual fraud were made for the purpose of causing Plaintiffs to pay for Lewiston's debts while preventing Plaintiffs from discovering, pursuing relief and obtaining relief for Lewiston's diversion of funds that were owed to Plaintiffs.

42.    Plaintiffs justifiably relied upon Lewiston's false pretenses, false representations and actual fraud by virtue of the parties' longstanding relationship.  Plaintiffs' justifiable reliance is further evidenced by the fact that the real estate market was in fact depressed which appeared to justify Lewiston's false and deceitful representations, actions and omissions.  Plaintiffs' justifiable reliance is further evidenced by the fact that the tax returns and K-1 forms were submitted to the federal and state governments as representations of the alleged true facts, when in fact they appear to be false.

43.    Plaintiffs have been damaged by Lewiston's false pretenses, false representations and actual fraud by virtue of the funds that are owed to them that Lewiston diverted for his and his family's benefit.  At present, Plaintiffs are uncertain as to the general range, let alone the precise amount, of their damages because Plaintiffs have not yet been provided with full and complete books and records for all of the companies in which they maintain ownership interests with Lewiston.  Such damages, however, should be well in excess of $1.6 million.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court:

A.    Except the more than $1.6 million owed to Plaintiffs from Lewiston's bankruptcy discharge pursuant to Bankruptcy Code Section 523(a)(2)(A);

B.    Award interest, cost of collection and attorney fees pursuant to FRBP Rule 7008(b); and

C.    Grant such other and further relief as is here appropriate.

## COUNT II
## EXCEPTION FROM DISCHARGE UNDER 11 U.S.C. § 523(a)(2)(B)

44.     Plaintiffs hereby incorporate by reference and reallege the allegations set forth in Paragraphs 1 through 43 as if fully restated herein.

45.     Section 523(a)(2)(B) provides that an individual debtor is not discharged from a debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by– use of a statement in writing – (i) that is materially false; (ii) respecting the debtor's or an insider's financial condition; (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and (iv) that the debtor caused to be made or published with intent to deceive."

46.     Lewiston ran the companies in which Plaintiffs maintain ownership interests with Lewiston as his alter egos, completely disregarding the company forms and agreements, and treating such companies as his own personal piggy banks where he consistently issued checks without authorization for his or his family's own benefit.

47.     For the years 2006 forward, the tax returns and K-1 forms prepared for the companies in which Plaintiffs maintain ownership interests with Lewiston reflected so-called intercompany loans which, in reality, were the funds that Lewiston diverted for his or his family's own benefit.

48.     Lewiston used the tax returns and K-1 forms, along with his memoranda, indemnification agreements and capital calls, to convey to Plaintiffs the impression that: (a) Lewiston was properly running the companies in which Plaintiffs maintain ownership interests with Lewiston; (b) Lewiston would honor his commitments to Plaintiffs; and (c) the loans and/or intercompany loans on the companies' books and records were legitimate.

49.     The tax returns, K-1 forms, memoranda, indemnification agreements and capital

17

calls were materially false because it was not true that: (a) Lewiston was properly running the companies in which Plaintiffs maintain ownership interests with Lewiston; (b) Lewiston would honor his commitments to Plaintiffs; and (c) the loans and/or intercompany loans on the companies' books and records were legitimate.

50.     The tax returns, K-1 forms, memoranda, indemnification agreements and capital calls therefore misrepresented Lewiston's financial condition and that of the companies in which Plaintiffs maintain ownership interests with Lewiston, all of which were Lewiston's alter egos and were insiders by definition pursuant to 11 U.S.C. § 101 in any event.  Further, various representations contained therein were misleading or totally false as above set forth and otherwise.

51.     Plaintiffs reasonably relied upon the tax returns, K-1 forms, memoranda, indemnification agreements and capital calls by virtue of the parties' longstanding personal and business relationship as well as the fact that the tax returns and K-1 forms were representations by Lewiston to the federal and state governments.  Plaintiffs' reliance was also reasonable given the fact that the depressed real estate appeared to justify Lewiston's false statements.

52.     Lewiston issued the tax returns, K-1 forms, memoranda, indemnification agreements and capital calls with the intent to deceive Plaintiffs.

53.     Lewiston issued tax returns, K-1 forms, memoranda, indemnification agreements and capital calls with the intent to deceive Plaintiffs for the purpose of causing Plaintiffs to pay Lewisotn's debts while preventing Plaintiffs from discovering, pursuing relief and obtaining relief for Lewiston's diversion of the funds that are owed Plaintiffs that Lewiston diverted for his and his family's benefit.

54.     Plaintiffs have been damaged by Lewiston's false statements.   At present,

Plaintiffs are uncertain as to the general range, let alone the precise amount, of their damages because Plaintiffs have not yet been provided with full and complete books and records for all of the companies in which they maintain ownership interests with Lewiston.  Such damages, however, should be well in excess of $1.6 million.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court:

A.      Except the more than $1.6 million owed to Plaintiffs from Lewiston's bankruptcy discharge pursuant to Bankruptcy Code Section 523(a)(2)(B);

B.      Award interest, cost of collection and attorney fees pursuant to FRBP Rule 7008(b); and

C.      Grant such other and further relief as is here appropriate.

### COUNT III
### EXCEPTION FROM DISCHARGE UNDER 11 U.S.C. § 523(a)(4)

55.      Plaintiffs hereby incorporate by reference and reallege the allegations set forth in Paragraphs 1 through 54 as if fully restated herein.

56.      Section 523(a)(4) provides that an individual debtor is not discharged from a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."

57.      Partners of a partnership owe a fiduciary duty to the partnership pursuant to Section 21 of the Michigan Uniform Partnership Act (MCL § 449.21).

58.      The manager of a limited liability company owes a fiduciary duty to the limited liability company pursuant to pursuant to Section 404 of the Michigan Uniform Limited Liability Company Act (MCL § 450.4404).

59.      Officers of a corporation owe a fiduciary duty to the corporation pursuant to Section 541a of the Michigan Business Corporation Act (MCL § 450.1541a).

60.      Lewiston ran the entities in which Plaintiffs maintain ownership interests with Lewiston as his alter egos, completely disregarding the company forms and agreements, and

19

treating such companies as his own personal piggy banks where he consistently issued checks without authorization for his or his family's own benefit and entered into agreements beneficial to the recipient and detrimental to Plaintiffs and others. Therefore, the company veils should be pierced such that Lewiston owed Plaintiffs a fiduciary duty of care in connection with those alter ego entities.

61.     Lewiston diverted more than $1.6 million that was owed to Plaintiffs for his and his family's benefit.

62.     Lewiston's diversion of the more than $1.6 million that was owed to Plaintiffs constitutes embezzlement and/or larceny exempting Lewiston's debt to Plaintiffs from discharge in this bankruptcy.

63.     Lewiston's diversion of the more than $1 million that was owed to Plaintiffs further constitutes fraud or defalcation while acting in a fiduciary capacity. Instead of holding the more than $1.6 million in trust for Plaintiffs and paying such funds to Plaintiffs, Lewiston diverted these funds for his and his family's benefit.

64.     Plaintiffs have been damaged by Lewiston's fraud or defalcation while acting in a fiduciary capacity, embezzlement, and/or larceny. At present, Plaintiffs are uncertain as to the general range, let alone the precise amount, of their damages because Plaintiffs have not yet been provided with full and complete books and records for all of the companies in which they maintain ownership interests with Lewiston. Such damages, however, should be well in excess of $1.6 million.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court:

    A.    Except the more than $1.6 million owed to Plaintiffs from Lewiston's bankruptcy discharge pursuant to Bankruptcy Code Section 523(a)(4);

    B.    Award interest, cost of collection and attorney fees pursuant to FRBP Rule

7008(b); and

C.    Grant such other and further relief as is here appropriate.

**COUNT IV**
**EXCEPTION FROM DISCHARGE UNDER 11 U.S.C. § 523(a)(6)**

65.    Plaintiffs hereby incorporate by reference and reallege the allegations set forth in Paragraphs 1 through 64 as if fully restated herein.

66.    Section 523(a)(6) provides that an individual debtor is not discharged from a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity."

67.    Lewiston's debt to Plaintiffs is excepted from discharge pursuant to Section 523(a)(6) based upon the following actions, without limitation, which Lewiston took with malice and with the knowledge and the intent that such actions would and did in fact cause injury to Plaintiffs.

A.    Lewiston ran the companies in which Plaintiffs maintain ownership interests with Lewiston as his alter egos, completely disregarding the company forms and agreements, and treating such companies as his own personal piggy banks where he consistently issued checks without authorization for his or his family's own benefit.

B.    For the years 2006 forward, the tax returns and K-1 forms prepared for the companies in which Plaintiffs maintain ownership interests with Lewiston reflected so-called intercompany loans which, in reality, were the funds that Lewiston diverted for his or his family's own benefit.

C.    Lewiston misrepresented the value of Summer Park even though the investment was never worth anywhere near that amount and ended up being worthless due to Lewiston's actions diverting funds for his and his family's benefit.

21

D.     Lewiston gave false, untruthful, inaccurate and misleading explanations for why capital calls from Plaintiffs were needed and why the companies in which Plaintiffs invested were not profitable.

E.     Lewiston issued capital calls in connection with the companies in which Plaintiffs invested long after Lewiston had written off his own interests in such companies as bad debts and worthless.

F.     Lewiston executed indemnification agreements with Murray Pitt on May 30, 2008 and August 13, 2010 without any present intention of honoring such agreements, which in fact Lewiston did not honor.

G.     Lewiston misrepresented and misstated his financial condition to Murray Pitt, orally and in his July 21, 2009 memorandum, for the purpose of having Richards-Pitt pay all settlement amounts in connection with the West Town Line, Capital Park and Summer Park loan defaults.

H.     Lewiston executed the August 13, 2010 Promissory Note and Confession of Judgment in favor of Richards-Pitt without any present intention of honoring such documents, which in fact Lewiston did not honor.

I.     Lewiston misrepresented and misstated the financial condition of FQA Associates, L.L.C. inasmuch as the French Quarter Apartments have been profitable and have regularly paid distributions since their purchase by FQA Associates, L.L.C. even though no such distributions were paid to the Gregory Richards CS Trust since 2005.

J.     With respect to Apartments at Cambridge, Lewiston issued a memorandum dated August 25, 2010 misrepresenting and misstating intercompany loans so that Lewiston and his family could seek repayments to which they were not entitled.  As but a few

examples, Lewiston diverted well in excess of $8 million to Apartments at Cambridge from other companies that he was managing even though: (a) such transfers were forbidden by those companies' respective partnership, operating and shareholder agreements; (b) Lewiston improperly booked many such transfers as loans made by Lewiston despite the fact that the monies came from those other companies and reflected other parties' ownership interests; and (c) Lewiston reimbursed himself for many such transfers -- Lewiston received checks totaling more than $6.6 million -- despite the fact that they came from those other companies and reflected other parties' ownership interests and therefore are not accounts receivable of Lewiston, but rather, those of the companies from which the monies were transferred and their members, partners, or shareholders, as the case may be.

K.     By way of illustration and not limitation, in managing the day-to-day operations of Apartments at Cambridge, Lewiston diverted as much as 50%, and perhaps more, of the company's gross revenue to himself and his affiliates.  Lewiston diverted nearly $590,000 to Lewiston-Crescentini Homes, Inc., a company owned by his son, Jason Lewiston, even though such persons or entities had no involvement whatsoever in Apartments at Cambridge.  Lewiston diverted nearly $4.2 million to Outdoor Solutions, Inc., a landscape contracting company owned by his son-in-law, Jeffrey Etterbeek, who is a tennis instructor by trade, and such amount is as much as four times the amount of money that the landscaping should have cost.  Curiously, there are no records of any bidding for such purported landscaping work. Lewiston diverted more than $1.7 million to LR Management Services Corporation, a purported apartment management company owned by Lewiston's daughter, Leslie Lewiston Etterbeek, even though: (a) Apartments at Cambridge is actually a condominium development such that no apartment management, or no management for the monies transferred, is required; (b) there is no

23

documentation justifying the more than $1.7 million paid to LR Management Services Corporation (e.g., who was paid from this money and for what were they paid); (c) there are no records of any bidding for the purported work for which LR Management Services Corporation was paid; and (d) Leslie Lewiston Etterbeek's company, Traditions Brokerage Services Corporation, was paid commissions of more than $1.5 million on condominium sales -- an amount far in excess of the reasonable value of services rendered and in excess of the traditional amounts due for like services rendered.

        L.     Lewiston used the personal guarantees executed by Murray Pitt (or his trust) in connection with the various Plaintiffs to hold Plaintiffs hostage and prevent them from pursuing any action against Lewiston for mismanaging the companies in which Plaintiffs invested for fear of the guarantees being pursued by the respective lenders.

        M.     To avoid his debts to Plaintiffs and obtain a bankruptcy discharge, Lewiston transferred his assets to his wife, children and his children's spouses within one year, but not more than six years, from the date of filing his bankruptcy petition in this matter. Such assets include more than $32 million in net income declared by Lewiston in 2006 as well as $9 million in U.S. Treasury Bills that Lewiston liquidated in 2007. Such assets further include ownership interests, direct and/or indirect, in more than two dozen different companies with significant if not substantial assets in the form of real property, apartments, rent, management fees and other assets. The transfer alleged above and others were fraudulent and the consequences thereof and resulting damages are exempted from discharge as amounts created by Lewiston's fraud.

        68.     Lewiston's conduct was willful as it was done with the intent of injuring Plaintiffs and preventing Plaintiffs from discovering, pursuing relief and obtaining relief from Lewiston's

diversion of monies owed to Plaintiffs.

69.     Lewiston's conduct was further willful and with intent to cause injury because, at a minimum, Lewiston believed that his conduct was substantially certain to result in Plaintiffs being prevented from discovering, pursuing relief and obtaining relief from Lewiston's diversion of funds that was owed to them and for injury to Plaintiffs resulting therefrom.

70.     Lewiston's conduct was malicious and intended to cause injury to Plaintiffs as it was committed without any justification or excuse whatsoever.

71.     Lewiston's conduct was malicious and with intent to injure as it was committed solely to injure Plaintiffs and benefit Lewiston and his family.

72.     Lewiston's conduct was also malicious as it was committed in conscious disregard of Lewiston's duties to Plaintiffs and without any legal justification whatsoever.

73.     Lewiston's intentional and malicious conduct caused injury to Plaintiffs as it was intended to do.  At present, Plaintiffs are uncertain as to the general range, let alone the precise amount, of their damages because Plaintiffs have not yet been provided with full and complete books and records for all of the companies in which they maintain ownership interests with Lewiston.  Such damages, however, should be well in excess of $1.6 million.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court:

A.     Except the more than $1.6 million owed to Plaintiffs from Lewiston's bankruptcy discharge pursuant to Bankruptcy Code Section 523(a)(6);

B.     Award interest, cost of collection and attorney fees pursuant to FRBP Rule 7008(b); and

C.     Grant such other and further relief as is here appropriate.

Respectfully submitted,

MORGANROTH & MORGANROTH, PLLC
By: /s/ Daniel E. Harold
MAYER MORGANROTH (P17966)
JEFFREY B. MORGANROTH (P41670)
DANIEL E. HAROLD (P61841)
Counsel for Plaintiffs
344 North Old Woodward Avenue, Suite 200
Birmingham, Michigan 48009
(248) 864-4000
dharold@morganrothlaw.com

SULLIVAN, WARD, ASHER & PATTON, P.C.
By: /s/ Wallace M. Handler
WALLACE M. HANDLER (P14598)
Of counsel to Plaintiffs
1000 Maccabees Center
25800 Northwestern Highway
Southfield, MI 48075-1000
(248) 746-0700
Dated: November 19, 2012        Email: whandler@swappc.com