UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In the Matter of:

RICHARD M. LEWISTON,

        Debtor.

_____/

Bankruptcy Case No. 12-58599
Hon. Philip J. Shefferly
Chapter 7

RICHARDS-PITT, L.L.C., GREGORY RICHARDS
CS TRUST and GREGORY RICHARDS MARITAL
TRUST,

        Plaintiffs,

vs.

RICHARD M. LEWISTON,

        Defendant,

and

GENE R. KOHUT, Chapter 7 Trustee for the
Bankruptcy Estate of Richard Martin Lewiston,

_____/

Adv. Pro. No. 12-06004

**PLAINTIFFS' ANSWER IN OPPOSITION TO CHAPTER 7 TRUSTEE'S MOTION TO
DISMISS PLAINTIFFS GREGORY RICHARDS CS TRUST AND GREGORY
RICHARDS MARITAL TRUST FOR LACK OF STANDING**

NOW COME Plaintiffs, by and through their attorneys, Morganroth & Morganroth, PLLC and Sullivan, Ward, Asher & Patton, P.C., of counsel, and, for their Answer in Opposition to Chapter 7 Trustee's Motion to Dismiss Plaintiffs Gregory Richards CS Trust and Gregory Richards Marital Trust for Lack of Standing, hereby state as follows.

1. In Answer to Paragraph 1, no answer is required to the Trustee's statement. In further Answer, Plaintiffs deny that the Trustee's motion has any basis in fact and law for reason untrue.

2. In Answer to Paragraph 2, Plaintiffs admit.

3. In Answer to Paragraph 3, Plaintiffs neither admit nor deny the allegations contained therein for lack of sufficient information upon which to form an opinion or belief.

This Answer in Opposition is further supported by an accompanying Brief in Opposition.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court deny the instant motion in its entirety and award to Plaintiffs all costs and attorney fees incurred in being forced to defend against it. A proposed order is attached to the accompanying Brief in Opposition.

Respectfully submitted,

| MORGANROTH & MORGANROTH, PLLC | SULLIVAN, WARD, ASHER & PATTON, P.C. |
|---|---|
| By: /s/ Daniel E. Harold | By: /s/ Wallace M. Handler |
| MAYER MORGANROTH (P17966) | WALLACE M. HANDLER (P14598) |
| DANIEL E. HAROLD (P61841) | Of counsel to Plaintiffs |
| Counsel for Plaintiffs | 1000 Maccabees Center |
| 344 North Old Woodward Avenue, Suite 200 | 25800 Northwestern Highway |
| Birmingham, Michigan 48009 | Southfield, MI 48075-1000 |
| (248) 864-4000 | (248) 746-0700 |
| dharold@morganrothlaw.com | whandler@swappc.com |

Dated: July 22, 2013

1

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In the Matter of:

RICHARD M. LEWISTON,

        Debtor.
_____/

Bankruptcy Case No. 12-58599
Hon. Philip J. Shefferly
Chapter 7

RICHARDS-PITT, L.L.C., GREGORY RICHARDS
CS TRUST and GREGORY RICHARDS MARITAL
TRUST,

        Plaintiffs,

vs.

Adv. Pro. No. 12-06004

RICHARD M. LEWISTON,

        Defendant,

and

GENE R. KOHUT, Chapter 7 Trustee for the
Bankruptcy Estate of Richard Martin Lewiston,
_____/

## PLAINTIFFS' BRIEF IN OPPOSITION TO CHAPTER 7 TRUSTEE'S MOTION TO DISMISS PLAINTIFFS GREGORY RICHARDS CS TRUST AND GREGORY RICHARDS MARITAL TRUST FOR LACK OF STANDING

## STATEMENT OF FACTS

Murray Pitt maintained a very close friendship with Debtor, Richard M. Lewiston ("Lewiston") for many years. (Dkt. No. 1 at ¶ 10)[1]. In addition, Lewiston had a business relationship with Murray Pitt's late son-in-law, Gregory Richards, as they invested in a number of real estate development projects together. *Id.* at ¶ 11.

As is relevant to the instant motion, Gregory Richards' investments are as follows. Gregory Richards became a 50% owner in a company known as Peninsula Development Associates, L.L.C. ("Peninsula Development") in which Lewiston was the other 50% owner and Managing Member. *Id.* Peninsula Development owns 33⅓% of a large real estate development company in Canton Township, Michigan known as Summer Park Associates, L.L.C. ("Summer Park") in which Lewiston served as the Managing Member who handled all of the day-to-day operations of the company. *Id.* Gregory Richards' ownership interest in Peninsula Development is held by Plaintiff, Gregory Richards CS Trust. *Id.*

Gregory Richards also became a 33⅓% owner in a company known as FQA Associates, L.L.C. ("FQA Associates") whose purpose was to own and operate the French Quarter Apartments in Southfield, Michigan. *Id.* Lewiston maintained a 33⅓% ownership interest in FQA Associates and served as the Managing Member who handled all of the day-to-day operations of the company. *Id.* Gregory Richards' ownership interest in FQA Associates is held by Plaintiff, Gregory Richards Marital Trust.

Gregory Richards also became a 33⅓% owner in a company known as JGR Associates, L.L.C. ("JGR Associates") in which Lewiston was the other 50% owner as well as the Managing

---

[1] This is Plaintiffs' Complaint Objecting to Debtor's Discharge Pursuant to 11 U.S.C. § 523 which is attached hereto as Exhibit 1 for convenient reference.

1

Member who handled the day-to-day operations of the company. *Id.* JGR Associates owned 50% of a large real estate development company in Ypsilanti, Michigan known as Tremont Park Associates, L.L.C. ("Tremont Park"). *Id.* Gregory Richards' 33⅓% ownership interest in JGR Associates is held as follows: the Gregory Richards CS Trust and the Gregory Richards Marital Trust each own ½ of Gregory Richards' ownership interest giving each trust a 16⅔% ownership interest in JGR Associates. *Id.*

Murray Pitt and/or his revocable trust had signed personal guarantees of loans secured by mortgages with various lenders on Summer Park as well as other real estate developments managed by Lewiston in which Gregory Richards invested. *Id.* at ¶ 12. Murray Pitt agreed to sign such guarantees based upon his close personal ties with Lewiston as well as Lewiston's representations that Gregory Richards' investments would be profitable. *Id.* As but one example, Lewiston represented to Murray Pitt that Summer Park was valued well in excess of their guarantees. *Id.*

Murray Pitt was effectively forced to assume, albeit passively, the management of Gregory Richards' investments with Lewiston after Gregory Richards perished in the September 11, 2001 terrorist attacks at the World Trade Center in New York. *Id.* at ¶ 13. Murray Pitt implicity trusted Lewiston and relied upon Lewiston to properly manage the companies in which Gregory Richards had invested by virtue of his (Murray Pitt's) close friendship with Lewiston as well as Lewiston's decades of experience in residential real estate, an industry in which Murray Pitt had no experience and no desire to enter. *Id.* at ¶ 14.

The companies in which Gregory Richards invested were not profitable and resulted in Murray Pitt having to arrange for Plaintiffs to make capital contributions of more than $7 million pursuant to capital calls issued by Lewiston. *Id.* at ¶ 15. Lewiston's explanation for the lack of

profitability and substantial capital calls was that many of the companies were in the early stages of development before any profits could be generated and that the depressed real estate market was compounding the problem. *Id.* at ¶ 16. Given their close friendship, Lewiston's real estate experience and the fact that the real estate market was in fact depressed, Murray Pitt had no reason to doubt Lewiston's explanation. *Id.* at ¶ 17.

During the summer of 2009, Murray Pitt and Lewiston were dealing with Bank of America in connection with the development loans on Summer Park, as well as other real estate developments managed by Lewiston in which Gregory Richards invested, which were in default and for which the Lewiston, Murray Pitt (or his trust) and the other member of those companies had signed guaranties. *Id.* at ¶ 20. Although the third Summer Park member (not a party in this adversary proceeding) came to a quick settlement for significantly less than that member might have otherwise owed, Lewiston failed to agree to such a settlement representing to Murray Pitt that Lewiston was just waiting for certain other financial arrangements to come through before he could close on such a settlement. *Id.* To allay Murray Pitt's concerns as to whether Lewiston had sufficient funds to resolve the loan defaults, Lewiston issued a July 21, 2009 memorandum to Murray Pitt stating that Lewiston was holding cash reserves of $1.8 million which Lewiston deemed to be sufficient to honor his obligations in connection with the Bank of America loans to Capitol Park, West Town Line and Summer Park. *Id.*; Exh. 2.

During the first part of 2010, it came to Murray Pitt's attention that Lewiston was being sued by his longtime business partners, the Smith family (Case No. 108330-CZ in the Oakland County Circuit Court before the Honorable Martha D. Anderson), for millions of dollars in connection with Lewiston's alleged diversion of funds from numerous companies. Exh. 1 at ¶

3

22[2].

In the summer of 2010, after approximately one year of dealing with Bank of America in connection with the loan defaults by Summer Park and other companies in which Gregory Richards invested, Lewiston finally represented to Murray Pitt that he would be able to close on a settlement as he had the funds and financial arrangements in place. *Id.* at ¶ 23. By that time, however, the terms of the settlement with Bank of America were far less favorable due to Lewiston's delay. *Id.*

With the Bank of America settlement set to close, Lewiston contacted Murray Pitt at the eleventh hour and stated that he (Lewiston) somehow did not have the funds to cover his portion of the settlement amount despite his statements to the contrary, but that he would have such funds within 60 days and would sign a promissory note and consent judgment if Murray Pitt arranged to front such funds for Lewiston. *Id.* at ¶ 24. Murray Pitt agreed to Lewiston's proposal given his need for the settlement in order to avoid Bank of America giving up and suing for the full balance of the loan defaults. *Id.* at ¶ 25. Thereafter, Lewiston executed a Promissory Note with a maturity dated of August 13, 2011 along with a Confession of Judgment. *Id.*

Prior to the Promissory Note maturing, Lewiston amended his tax returns for 2008 claiming that his investment in Summer Park was worthless in direct contravention to his prior representation to Murray Pitt that the development was worth $30 million. Exh. 1 at ¶ 21; Exh. 3. Unbeknownst to Murray Pitt, Lewiston had actually written off his (Lewiston's) interest in Summer Park in his 2006 tax returns as a worthless and bad debt even though he continued to issue capital calls to Pitt through 2008. *See*, Exh. 4.

---

[2]    The Smith family has also filed a Complaint Objecting to Debtor's Discharge Pursuant to 11 U.S.C. § 523 which is Adversary Proceeding No. 12-06006.

4

As of August 14, 2011, Lewiston was in default under his Promissory Note and a Judgment was entered against him (Case No. 11-122385-CK in the Oakland County Circuit Court) on October 14, 2011 for the amount of $1,604,790, plus interest at 10% per annum, plus reasonable attorneys' fees and costs of collection. *Id.* at ¶ 27. With his debts mounting, Lewiston voluntarily filed his Chapter 7 bankruptcy petition on August 13, 2012. *Id.* at ¶ 28.

As the Gregory Richards CS Trust and Gregory Richards Marital Trust (collectively, the "Trusts") have discovered, Lewiston ran the companies in which the Trusts maintain ownership interests with Lewiston as his alter egos, completely disregarding the company forms and agreements, and treating such companies as his own personal piggy banks where he consistently issued checks without authorization for his or his family's own benefit. *Id.* at ¶¶ 37, 46, 50, 60, 67. As a result of Lewiston's actions and Debts to the Trusts, the Trusts have commenced this Adversary Proceeding pursuant to 11 U.S.C. § 523 as well as an Adversary Proceeding pursuant to 11 U.S.C. § 727 (Adv. Proc. No. 12-06010).

## ARGUMENT

### I. STANDARDS OF REVIEW.

#### A. <u>Constitutional Standing</u>.

Article III of the United States Constitution limits the jurisdiction of federal courts to actual "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. To satisfy this "case-or-controversy" requirement, a plaintiff must establish three elements: (1) an injury in fact that is concrete and particularized; (2) a connection between the injury and the conduct at issue, meaning that the injury must be fairly traceable to the defendant's action; and (3) a likelihood that the injury would be redressed by a favorable decision of the court. *See, Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992).

5

B. **Prudential Standing.**

Unlike constitutional standing under Article III, prudential standing is a judicially created doctrine relied upon as a tool of "judicial self-governance." *Warth v. Seldin*, 422 U.S. 490, 500, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975). Prudential standing requirements preclude litigation in federal court where the harm alleged is a generalized grievance shared in substantially equal measure by all or a large class of citizens, or where the plaintiff rests his/her claims for relief on the legal rights or interests of third parties. *Id.* at 499. The second instance is consistent with Federal Rule of Civil Procedure 17(a) which requires that an action must be prosecuted in the name of the real party in interest. *See*, Fed. R. Civ. P. 17(a). Prudential standing requirements also preclude litigation in federal court where a plaintiff's complaint falls outside of interests to a protected or regulated by a statute or constitutional guarantee in question. *See, Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 475, 102 S. Ct. 752, 70 L. Ed. 2d 700 (1982).

II. **THE TRUSTS ABSOLUTELY HAVE CONSTITUTIONAL AND PRUDENTIAL STANDING TO MAINTAIN THEIR ADVERSARY PROCEEDING AGAINST LEWISTON AS THE MANAGING MEMBER OF THE LIMITED LIABILITY COMPANIES IN WHICH THEY INVESTED.**

A. **Members of A Limited Liability Company May Sue for Personal Damages Pursuant to Section 515 of the Michigan Limited Liability Company Act (M.C.L. § 450.4515).**

The Trustee only cites to limited provisions of the Michigan Limited Liability Company Act as well as non-binding cases from other states or involving other states' laws which are outside of our jurisdiction to contend that the Trusts, as members of the various limited liability companies managed by Lewiston, have no standing to sue because their alleged damages would somehow belong to the companies (i.e., the claims would be a derivative action as opposed to a direct action).

6

The Trustee, however, has overlooked Section 515 of the Michigan Limited Liability Company Act which expressly provides that <u>a member of a limited liability company may sue for damages</u>. *See*, M.C.L. § 450.4515. Section 515 provides as follows:

> (1) **A member of a limited liability company may bring an action** in the circuit court of the county in which the limited liability company's principal place of business or registered office is located **to establish that acts of the managers or members in control of the limited liability company are illegal or fraudulent or constitute willfully unfair and oppressive conduct toward the limited liability company or the member.** If the member establishes grounds for relief, the circuit court may issue an order or grant relief as it considers appropriate, including, but not limited to, an order providing for any of the following:
>
> (a) The dissolution and liquidation of the assets and business of the limited liability company.
>
> (b) The cancellation or alteration of a provision in the articles of organization or in an operating agreement.
>
> (c) The direction, alteration, or prohibition of an act of the limited liability company or its members or managers.
>
> (d) The purchase at fair value of the member's interest in the limited liability company, either by the company or by any members responsible for the wrongful acts.
>
> (e) **An award of damages** to the limited liability company or **to the member.** An action seeking an award of damages must be commenced within 3 years after the cause of action under this section has accrued or within 2 years after the member discovers or reasonably should have discovered the cause of action under this section, whichever occurs first.
>
> (2) As used in this section, **"willfully unfair and oppressive conduct" means a continuing course of conduct or a significant action or series of actions that substantially interferes with the interests of the member as a member.** Willfully unfair and oppressive conduct may include the termination of employment or limitations on employment benefits to the extent that the actions interfere with distributions or other member interests disproportionately as to the affected member. The term does not include conduct or actions that are permitted by the articles of

7

organization, an operating agreement, another agreement to which
the member is a party, or a consistently applied written company
policy or procedure. *Id.* (Emphasis added).

Therefore, the Trustee's position fails as a matter of law inasmuch as the Trusts, as members of the various limited liability companies managed by Lewiston, may absolutely file a direct suit for damages pursuant to Section 515 of the Michigan Limited Liability Company Act. *Id. See also*, *Menuskin v. Williams*, 145 F.3d 755, 768 (6th Cir. 1998) ("we must interpret statutes as a whole, giving effect to each word and making every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous") (internal quotations omitted).

The bottom line is that the Trusts, as members of the various limited liability companies managed by Lewiston, may absolutely file a direct suit for damages pursuant to Section 515 of the Michigan Limited Liability Company Act. M.C.L. § 450.4515. This is the law by which the Trustee and the parties are bound, and any other result would impermissibly negate Section 515 of the Michigan Limited Liability Company Act. *Id.*

**B.     The Trusts Have Set Forth Direct and Distinct Claims for Damages.**

As previously set forth in the Trusts' Brief in Opposition to the Trustee's Omnibus Objection to Plaintiffs' Proofs of Claim and in the Proofs of Claim themselves, the Trusts' Proofs of Claim are based upon their personal damages in connection with Lewiston's diversion of funds from Apartments at Cambridge. *See*, Exhs. 5-6. Specifically, the Trusts' Proofs of Claim state the basis for their claims against Lewiston as "[e]mbezzled funds and converted ownership interests" with the following explanation:

> [The Trusts] maintain[] two adversary proceedings against Debtor, Richard Martin Lewiston ("Lewiston"): (1) Adversary Proceeding No. 12-06004-pjs pursuant to 11 U.S.C. § 523; and (2) Adversary Proceeding No. 12-06010-pjs pursuant to 11 U.S.C. §

8

727. As set forth in the Complaints of these Adversary Proceedings, **Lewiston embezzled funds and converted ownership interests belonging to the Trust[s].**

> The amount of Trust[s'] claim[s] as of the date of filing the Trust[s'] Proof[s] of Claim is conservatively stated as [$211,394.00 and $422,394.00] with the qualifications that: (1) the Trust[s] [have] not been provided with complete and updated books and records from Lewiston concerning the companies in which the Trust[s] maintain[] ownership interests as well as each and every individual and entity who received funds belonging to the Trust[s]; and (2) the Trust[s] [are] in the process of retaining expert witnesses to perform forensic accounting and valuation analyses, among other related tasks, in connection with the value of the Trust[s'] ownership interests and the Trust[s'] embezzled funds. Based upon the foregoing qualifications, the Trust[s] reserve[] the right to amend and/or modify [their] Proof[s] of Claim as discovery is obtained and completed in [their] Adversary Proceedings. *Id.* (Emphasis added).

In further support of their Proofs of Claim, the Trusts have attached their records confirming the amounts set forth in their respective Proofs of Claim. Specifically, as of the date of filing their Proofs of Claim, the most recent tax return (2007) for JGR Associates in the Trusts' possession reflected that the Gregory Richards CS Trust had a capital account of $197,641, and the Gregory Richards Marital Trust had a capital account of $197,644. *See*, Exhs. 7-8. In addition (at a minimum), JGR Associates received a distribution in the amount of $98,500. *See*, Exh. 9. Although the Trusts' combined share of that distribution should have been $32,833.33 ($16,416.66 apiece), Lewiston never provided them with their respective shares of that distribution. Thus, the Trusts' actual capital accounts should have respectively been $214,057 and $214,060. With respect to the Gregory Richards Marital Trust's additional ownership interest in FQA Associates, approximately $211,000 was contributed by the Marital Trust, thus substantiating the Gregory Richards Marital Trust's Proof of Claim in the amount of

9

$422,394.00. *See*, Exh. 10 at ¶ 4. Therefore, the Trusts have absolutely alleged permissible damages unique to them.

### C. The Alter Ego/Piercing the Corporate Veil Doctrine Absolutely Applies to the Trusts.

As set forth in Paragraphs 37, 46, 50, 60 and 67 of the Complaint, Lewiston ran the companies in which the Trusts maintain ownership interests with Lewiston as his alter egos, completely disregarding the company forms and agreements, and treating such companies as his own personal piggy banks where he consistently issued checks without authorization for his or his family's own benefit. *Id.* at ¶¶ 37, 46, 50, 60, 67. As further alleged in the Complaint and confirmed by the underlying records, Lewiston misrepresented that Summer Park's real estate development was worth $30 million even though, unbeknownst to Murray Pitt, Lewiston had written off his interest in Summer Park in 2006 as a worthless and bad debt even though Lewiston continued to issue capital calls to Murray Pitt through 2008. Exh. 1 at ¶ 21; Exhs. 3-4. Lewiston also misrepresented that he had cash reserves of $1.8 million to satisfy his portion of the defaulted development loan on Summer Park. *See*, Exh. 2. Lewiston further misrepresented that he would have the funds to repay the Promissory Note in connection with the settlement on the defaulted development loan on Summer Park within 60 days of settling with the bank. Exh. 1 at ¶¶ 24-27.

As of Lewiston's filing for bankruptcy, the Trusts have discovered numerous other instances of fraudulent conduct by Lewiston. For instance, the Trusts have discovered Lewiston's testimony from February 12, 2009 in an unrelated arbitration proceeding wherein Lewiston testified that: "Murray [Pitt] and I are partners in a -- an apartment project in Southfield, Michigan called French Quarter Apartments [owned by FQA Associates], which has been profitable since the day we bought it. Distributions are made regularly." Exh. 11 at 136.

Contrary to Lewiston's sworn testimony, no distributions have been made to the Gregory Richards Marital Trust since 2005 -- four years before Lewiston's sworn testimony as to the company's profitability and regular distributions. *See*, Exh. 10 at ¶ 5. As but another example, Gregory Richards provided two loans in the amounts of $95,500 and $100,000 to JGR Associates at Lewiston's request. *Id.* at ¶ 6. Funds in the amount of $95,500 were then diverted from JGR Associates by Lewiston to Founders Woods Associates, a company co-owned and managed by Lewiston in which Gregory Richards had no interest, with the other $100,000 unaccounted for. *See*, Exh. 12. Lewiston then issued checks from Founders Woods Associates to JGR Associates in the amount of $195,500 without repaying Gregory Richards or properly accounting for such funds. *See*, Exh. 13.

In an attempt to avoid the Trusts' allegations and the mounting supporting evidence as discovery progresses, the Trustee erroneously contends that the Trusts' allegations under the alter ego/piercing the corporate veil doctrine somehow cannot apply here because the doctrine only applies to third parties.

> The basic law for piercing the corporate veil in Michigan is as follows:
>
> > We recognize the general principle that in Michigan separate entities will be respected. See *Klager v Robert Meyer Co*, 415 Mich 402; 329 NW2d 721 (1982), *Finley v Union Joint Stock Land Bank of Detroit*, 281 Mich 214; 274 NW2d 768 (1937), and *Gledhill v Fisher & Co*, 272 Mich 353; 262 NW 371 (1935).
> >
> > However, the fiction of a distinct corporate entity separate from its stockholders is a convenience introduced in the law to subserve the ends of justice. When this fiction is invoked to subvert justice, it is ignored by the courts. *Paul v University Motor Sales Co*, 283 Mich 587, 602; 278 NW 714 (1938).

*Wells v. Firestone Tire and Rubber Co.*, 421 Mich. 641, 650; 364 N.W.2d 670 (1985).

Contrary to the Trustee's argument, the alter ego/piercing the corporate veil doctrine

11

absolutely applies to individual owners of a company, notwithstanding Section 515 of the Michigan Limited Liability Company Act. Specifically, the Michigan Supreme Court has held as follows in direct contravention of the Trustee's argument:

> Although traditionally the doctrine of "piercing the corporate veil" has been applied to protect a corporation's creditors, or other outsiders, where the corporate entity has been used to avoid legal obligations, *People ex rel Attorney General v Michigan Bell Telephone Co*, 246 Mich 198; 224 NW 438 (1929), **Michigan courts have recognized that it may be appropriate to invoke the doctrine for the benefit of a shareholder where the equities are compelling.** See, *e.g.*, *Montgomery v Central National Bank & Trust Co of Battle Creek*, 267 Mich 142; 255 NW 274 (1934).

*Wells*, 421 Mich. at 650-651 (emphasis added).

As repeatedly stated herein, Section 515 of the Michigan Limited Liability Company Act expressly provides that a member of a limited liability company may sue for damages based upon a managing member's (e.g., Lewiston's) illegal, fraudulent and willfully unfair and oppressive conduct. *See*, M.C.L. § 450.4515. This is the public policy/law of the State of Michigan. *Id.* Thus, while it may be true in general (i.e., a majority of cases) that the alter ego/piercing the corporate veil doctrine arises in situations involving non-owner creditors, this is not exclusively the case nor is the alter ego/piercing the corporate veil exclusive to non-owner creditors as the Trustee tacitly acknowledges. *Wells*, 421 Mich. at 650-651.

As for whether it is appropriate to pierce the corporate veil in this case in connection with the Trusts' claims, this is a question of fact and <u>not</u> a question of law. *See, Foodland Distributors v. Al-Naimi*, 220 Mich. App. 453, 456; 559 NW2d 379 (1996) ("There is no single rule delineating when the corporate entity may be disregarded"). In assessing whether a corporate entity may be disregarded, "the entire spectrum of relevant fact forms the background for such inquiry." *Klager v Robert Meyer Co.*, 415 Mich. 402, 411-412; 329 N.W.2d 721

12

(1982). To assist in such analysis, the Michigan Court of Appeals has created the following three-pronged test whereby the corporate veil is pierced if: (1) the entity is a mere instrumentality of another; (2) the entity was used to commit a fraud or wrong; and (3) the plaintiff suffered an unjust loss or injury. *See, Foodland Distributors*, 220 Mich App at 457, citing, *SDC Chemical Distributors, Inc. v Medley*, 203 Mich. App. 374, 381; 512 N.W.2d 86 (1994).

As set forth above, the Trusts have sufficiently pled allegations that satisfy this test. Exh. 1 at ¶¶ 37, 46, 50, 60, 67. Furthermore, the allegations are supported by evidence, even at this early stage in the case. *See*, Exhs. 1-13.

## CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that this Honorable Court deny the instant motion in its entirety and award to Plaintiffs all costs and attorney fees incurred in being forced to defend against it. A proposed order is attached hereto as Exhibit 14.

Respectfully submitted,

| MORGANROTH & MORGANROTH, PLLC | SULLIVAN, WARD, ASHER & PATTON, P.C. |
|---|---|
| By: /s/ Daniel E. Harold | By: /s/ Wallace M. Handler |
| MAYER MORGANROTH (P17966) | WALLACE M. HANDLER (P14598) |
| DANIEL E. HAROLD (P61841) | Of counsel to Plaintiffs |
| Counsel for Plaintiffs | 1000 Maccabees Center |
| 344 North Old Woodward Avenue, Suite 200 | 25800 Northwestern Highway |
| Birmingham, Michigan 48009 | Southfield, MI 48075-1000 |
| (248) 864-4000 | (248) 746-0700 |
| dharold@morganrothlaw.com | whandler@swappc.com |

Dated: July 22, 2013